## HACKNEY v. ELLIOTT.

(137 N. W. 433.)

**Drains — establishment of drains — petition — tax certificates — assessments — notice — order establishing drain.**

This is an action to cancel tax certificates on sale for special drainage assess-

Note.—The authorities on the procedure for establishment of drain or sewer are collated in an elaborate note in 60 L.R.A. 161.

As to what property is liable for assessment for construction of drains or sewers, see notes in 58 L.R.A. 353 and 26 L.R.A.(N.S.) 973.

On the question of the waiver of the objection that assessment exceeds the percentage limited by charter or statute, see note in 38 L.R.A.(N.S.) 582.

ments arising from the tri-county drain in Ransom, Sargent, and Richland coun-
ties, on nonpayment of which assessments plaintiff's lands were sold.  *Held:*—

1. That the petition for drainage presented to the Richland county drainage
board was sufficient to confer jurisdiction upon said board to act.

(a) Our drainage statutes were adopted·from the Michigan drainage statutes
in force in 1893.

(b) A petition for drainage of agricultural lands need not contain an aver-
ment of the necessity for the proposed drain, nor that it will drain agricultural
lands, nor that the signers thereto are freeholders whose lands will be affected
by the proposed drain, nor other than a general description with beginning and
end of the course of the proposed drain.  Upon the board finding the existence
of necessity for the drain, and that the petition was signed by a sufficient num-
ber of qualified petitioners; and finding the purpose to be that of drainage of
agricultural lands, with such finding based upon a survey had of the course of
the drain and establishment of its commencement, terminus, route, width, and
depth thereof; and after the preparation and filing of profiles, plans, specifica-
tions, estimates of cost, and map or plat of the lands to be drained, and a find-
ing that the benefits to be derived will exceed the total cost of construction
thereof,—the drainage board is then authorized by law to construct said
drain, such findings curing defects in the petition because of its failure to
designate the purpose thereof, and that the same will result to the benefit of
the health, convenience, or welfare, or show that the signers thereof are legally
qualified as such.

(c) In determining the sufficiency of the petition to confer jurisdiction to
act thereunder, the drainage board may take judicial notice of and consider
with said petition the fact that the course of the drain as petitioned for will
traverse agricultural lands, and also of the character of another drain of which
the petition recites the one petitioned for would be but a continuation of, and
of all such other matters of location, place, distance, extent, area, topography,
and general condition of lands within its county as a court would be authorized
to take judicial notice of under Code, §§ 7318 and 7319.

(d) Where the order establishing a drain makes reference to the surveyor's
minutes of a survey, profiles, plans, and specifications filed with the county
auditor, these may be considered with and as supplementing the description con-
tained in the order establishing such drain.

(e) Where a petition has been acted upon and a drain established there-
under, the fact that it contains an unnecessary word obscuring its meaning,
when with such word omitted the meaning would be plain, the petition will
not be held void as unintelligible.

(f) The action of the county drainage board in incorporating in the order
establishing the main drain an order establishing a spur or branch drain will
not, under the record herein, be held to invalidate all proceedings had, and
relieve plaintiff's lands in another county from their assessment to defray con-

struction of the tri-county drain. Such are but irregularities, and do not go to the board's jurisdiction.

**Drains — assessment — apportionment — percentage.**

2. The apportionment of benefits by percentages *held* valid.

(a) The placing of the words "per cent" at the head of a column of decimal fractions, apportioning such decimal fractional part of the total benefits as is received by the specific tract opposite such decimal fraction to it, does not indicate that the tax to be calculated thereon shall be computed by taking such decimal fractional part of 1 per cent of the entire cost of construction, but instead, such decimal fractional part of the entire cost. The words "per cent," as so used, mean the decimal fractional part or share by decimal part or percentage of the whole. Such schedule of apportionment of benefits by decimal fractional part or percentage thereof will be calculated under the usual interpretation, instead of by a strained construction.

(b) In the absence of a showing of a want of uniformity in such apportionment of specific benefits, the presumption will be in favor of its validity and that the tax computed therefrom was not excessive.

**Drains — constitutional law — assessments — apportionment — process — tri-county drains.**

. 3. The apportionment of specific benefits, when made, not being based upon or having any relation to either the estimated or actual cost of the project, the fact that the actual cost may far exceed the estimated cost thereof can in no wise affect the validity of the apportionment of benefits by percentages.

(a) Nor can any excess of actual overestimated cost of construction be considered as in effect the taking of property without due process of law, or as rendering the drainage act unconstitutional because thereof.

(b) The fact that the notice of hearing of apportionment of benefits by percentages as to specific tracts, and that the notice of confirmation thereof, contained an erroneous estimate of the total cost of construction, does not alone render the portion of the assessment in excess of the estimated cost, but within the actual cost of construction as levied against such tracts and computed by such percentages of the total actual cost, invalid as the taking of property without due process of law.

(c) After petitions for the establishment of the portion of the tri-county drain within each county had been severally granted, and the portion of the drain in each county severally established by each county board, it was the duty of the three county drainage boards to meet in joint session, under § 1836, to determine the proportion of the whole benefits to be derived from the drain the lands within each county will receive therefrom; in so acting the tri-county board does not deal with individual tracts as such, but instead, with a county apportionment of benefits, considering collectively each county's lands benefited, and determining the proportion each county's lands bears to all the lands benefited; as in percentages of benefits received, so in damages for right of way

and property taken under eminent domain for public use. Such joint board has no duties other than such county apportionments and calculation of total cost of drain.

(d) In such apportionment, each county board acts severally as an integral part of the joint or tri-county body.

(e) After such apportionment between the counties by percentages of benefits received, proportionate to total benefits from the drain, the fact that thereafter the three boards met in joint session and jointly and severally as boards signed and put forth a list of special assessments as to each and all the tracts within the three counties so benefited by the drain, but computed on a proper basis of percentage of benefits in the same manner as would have resulted had each board separately determined said assessment in specific amounts, will not invalidate the tax so apportioned in specific amounts to each tract, where the lands are classified by counties, with a direction accordingly to the county auditors to spread the assessments against such lands described as are situated within their several counties. Such a list amounts but to the issuance of three several lists in which each county board determines the tax in specific amounts upon lands within its county. The fact that they unauthorizedly so acted in joint session does not invalidate such assessments.

**Statutory requirements — drains — establishment — irregularities.**

4. Section 1827 in terms requires the board of drain commissioners of each county, prior to the letting of contracts for the construction of the drain, to make a return to the county auditor, and requires that "such return shall contain" certain papers, minutes, and proceedings. The board of drain commissioners of Ransom county made such return. This statute requires the recording of said return by the auditor. This return was never recorded. *Held*, that the making of such record is not inherently a part of or condition precedent to the assessment, but instead, merely a legislative requirement, and as such for the purpose of procuring a record to be made of prior proceedings; that such recording is not required that constructive notice be given thereby of previous proceedings, notice of which had prior thereto been required to be given otherwise. Such failure to record is a mere irregularity not invalidating the assessment; the statute being directory, and not mandatory.

**Drains — assessments — sales — notice to purchaser — estoppel.**

5. The pendency of an action at the time of the tax sale, brought by this plaintiff against Ransom county to determine the validity of these special drainage assessments, but not enjoining the sale therefor, is not of itself constructive notice to a purchaser at such tax sale of any rights of the plaintiff, so as to prevent such purchaser from asserting in a subsequent action brought by the former plaintiff any rights of estoppel, or otherwise that might have been available by the county in its defense in the original action.

**Drains — assessments — estoppel — rights of county.**

6. Jurisdiction having been conferred upon the drain boards to establish and

construct this drain, and an apportionment of benefits and assessment based thereon having been made by the proper authorities, resulting in the tax having been spread and becoming a lien by operation of law, all without plaintiff's objection, and with his actual knowledge that his lands, with others, were being benefited by the construction of the drain, at great expense, of the making of which he had actual notice, said proceedings covering a period of nearly five years, during which period before and since the completion of the project he has remained acquiescent, he having granted right of way though not a petitioner for drainage, plaintiff will not be heard in equity to assert the invalidity of special assessments levied upon his property to defray such property's proportionate share of the cost of the drain.

(a) Such rule of estoppel is enforceable and applicable in this action between private parties. The distinction applied in early tax cases in this state, to the effect that there was a difference in principle between an action against a county for cancelation of a tax and the determination of such an issue in an action to quiet title between private parties, and since in later cases disapproved, refused recognition and application in this action to quiet title.

(b) Defendant as a purchaser at a tax sale is *held* to be subrogated to all the rights possessed under said tax by Ransom county at the time of such sale.

**Drains — assessments — evidence — fraud.**

7. There is no sufficient proof of any fraud on the part of the drainage board.

**Drains — assessments, valid as levied, together with interest.**

8. The special assessments so levied for said purposes upon plaintiff's land in 1908 were and are valid as such for the amount so levied, together with interest thereon at 7 per cent from date of delinquency, March 1, 1909.

**Taxation — sales — notice — uncertainty of description of land.**

9. That the notice of delinquent tax sale was invalid and vitiated the sale as to plaintiff's lands in Rosemead civil township. The first of the three published notices of sale listed the lands as situated within the township of Rosemead, but the township was particularly described by range as range 55, instead of the correct description of range 53. After one publication the sale notice was corrected. *Held* to have been an insufficient notice of tax sale and void for uncertainty of description of land to be sold, and as two publications were insufficient notice, the sale had thereon was void.

**Drains — assessment — delinquent drainage assessments bear interest.**

10. Under the statutes prior to chap. 298, Session Laws 1911, and as existing at all times in issue, no statutory interest or statutory penalty having been specifically provided to be collected upon delinquent drainage assessments arising from the construction of drains to agricultural lands, none can be collected. And the provisions of law applicable to the collection of penalty and interest on real estate taxes, and that such assessments "shall be collected and enforced in the same manner as other taxes," is insufficient to authorize the collection of

such statutory interest and penalty on drainage assessments. Such delinquent drainage assessments bear interest at 7 per cent per annum from and after delinquency.

**Taxation — sufficiency of payment of taxes.**

11. Following State ex rel. Moore v. Furstenau, 20 N. D. 540, 129 N. W. 81, plaintiff's payment of his general taxes before sale, without a tender of the special assessments for drainage purposes, was a payment of the general land tax; and such sale for plaintiff's general taxes and the certificates issued thereon are void and are ordered canceled. General land taxes may be paid without making payment of special drainage assessments.

**Tax sale for drainage assessments — costs — test case.**

12. Equitable relief as to the tax sale for drainage assessments is awarded as to certificates issued and interest, penalty, and costs of sale; but relief is conditioned, however, upon payment being made by plaintiff within sixty days from the filing of the remittitur herein in the district court of the amount of all special assessments involved, with interest at 7 per cent per annum from March 1, 1909, to date of payment. In case of payment within said period, no costs will be taxed, this being a test case. In default of payment within said period, plaintiff's action will be dismissed and judgment entered against plaintiff for all of respondent's taxable costs and disbursements.

Opinion filed May 1, 1912.

Appeal by plaintiff from a judgment of the District Court for Ranson County, *Allen*, J., holding valid certain drainage assessment taxes levied against plaintiff's property.

Modified on condition and affirmed.

*Purcell & Divet*, and *Ashley Coffman*, of counsel, for appellant.

The petition presented to the Richland county board was insufficient to confer jurisdiction to establish the drain. Deisner v. Simpson, 72 Ind. 435; Whitford Twp. v. Phinney, 53 Mich. 130, 18 N. W. 593; Morse v. Omaha, 67 Neb. 426, 93 N. W. 734; Miller v. Amsterdam, 149 N. Y. 288, 43 N. E. 632; Barker v. Wyandotte County, 45 Kan. 699, 26 Pac. 591; Noffzigger v. McAllister, 12 Kan. 315; Allen v. Portland, 35 Or. 420, 58 Pac. 509.

The order should not only establish the length and course of the drain, but its width, as the necessities of a right of way are not otherwise ascertainable. Mitchell v. Lane, 62 Hun, 253, 16 N. Y. Supp. 707; Page & J. on Taxation by Assessment, § 800; Watkins v. Griffith, 59 Ark. 344, 27 S. W. 234; Re Drake, 69 Hun, 95, 23 N. Y. Supp.

264; London v. Sample Lumber Co. 91 Ala. 606, 8 So. 281; Vail v. Morris & E. R. Co. 21 N. J. L. 189; State, Trenton & N. B. Turnp. Co., Prosecutors, v. American & E. Commercial News Co. 43 N. J. L. 381; California C. R. Co. v. Hooper, 76 Cal. 404, 18 Pac. 599; Null v. Zierle, 52 Mich. 540, 18 N. W. 348; Mathias v. Carson, 49 Mich. 465, 13 N. W. 818; Ross v. State, 119 Ind. 90, 21 N. E. 345.

The provision, providing for the record of the return of the drainage board to the auditor must be held to be mandatory. Sweigle v. Gates, 9 N. D. 544, 84 N. W. 481; Cooley, Taxn. pp. 284, 285; Deitz, Taxn. § 106; Fraser v. Mulany, 129 Wis. 377, 109 N. W. 139; Indiana Bond Co. v. Shearer, 24 Ind. App. 622, 57 N. E. 276; Rauer v. Lowe, 107 Cal. 229, 40 Pac. 337.

The assessment roll must show the amount of the assessment with such certainty that the amount can be readily determined therefrom. Page & J. Special Assessments, § 883; People v. San Francisco Sav. Union, 31 Cal. 132; People v. Hastings, 34 Cal. 571; Chicago v. Walker, 24 Ill. 494; Etchison Ditch Asso. v. Hillis, 40 Ind. 408; Spokane Falls v. Browne, 3 Wash. 84, 27 Pac. 1077; Lake County v. Sulphur Bank Quicksilver Min. Co. 66 Cal. 17, 4 Pac. 876; McChesney v. People, 145 Ill. 614, 34 N. E. 431.

*Curtis & Curtis* and *Rourke & Krello,* for respondent.

The petition is valid. Sim v. Rosholt, 16 N. D. 77, 11 L.R.A. (N.S.) 372, 112 N. W. 50; Karr v. Putnam County, 170 Ind. 571, 85 N. E. 1; Auditor General v. Bolt, 147 Mich. 283, 111 N. W. 74.

The petition, if irregular or invalid, cannot be impeached in collateral actions of this kind. Morrill v. Morrill, 20 Or. 96, 11 L.R.A. 155, 23 Am. St. Rep. 95, 25 Pac. 362; Smith v. Morrill, 12 Colo. App. 233, 55 Pac. 824; Peyton v. Peyton, 28 Wash. 278, 68 Pac. 757; Oliver v. Monona County, 117 Iowa, 43, 90 N. W. 510; Griffith v. Pence, 9 Kan. App. 253, 59 Pac. 677; State ex rel. Mayfield v. Myers, 100 Ind. 487; Jackson v. State, 104 Ind. 516, 3 N. E. 863; Pickering v. State, 106 Ind. 228, 6 N. E. 611; McMullen v. State, 105 Ind. 334, 4 N. E. 903; Deegan v. State, 108 Ind. 155, 9 N. E. 148; Montgomery v. Wasem, 116 Ind. 343, 15 N. E. 795; McBride v. State, 130 Ind. 525, 30 N. E. 699; State ex rel. Wilcox v. Jackson, 118 Ind. 553, 21 N. E. 320; Perkins v. Hayward, 132 Ind. 95, 31 N. E. 670.

Whether the Richland county board was properly organized would not affect the validity of the Ransom county tax. Cleveland v. McCanna, 7 N. D. 455, 41 L.R.A. 852, 66 Am. St. Rep. 670, 75 N. W. 908; Merchants' Nat. Bank v. McKinney, 2 S. D. 106, 48 N. W. 841; People ex rel. Selby v. Dyer, 205 Ill. 575, 69 N. E. 70; Sim v. Roshholt, 16 N. D. 80, 11 L.R.A.(N.S.) 372, 112 N. W. 50; State ex rel. Utick v. Polk County, 87 Minn. 325, 60 L.R.A. 161, 92 N. W. 216.

*Flynn & Traynor* and *C. F. Clark,* for intervener, E. R. Moore.

The facts are clearly sufficient to establish the estoppel. State Finance Co. v. Beck, 15 N. D. 374, 109 N. W. 357; State Finance Co. v. Mather, 15 N. D. 386, 109 N. W. 350, 11 Ann. Cas. 1112; State Finance Co. v. Trimble, 16 N. D. 199, 112 N. W. 984; Powers v. First Nat. Bank, 15 N. D. 466, 109 N. W. 361; Brosemer v. Kelsey, 106 Ind. 504, 7 N. E. 569; Prezinger v. Fording, 114 Ind. 599, 16 N. E. 499; Ross v. Stackhouse, 114 Ind. 200, 16 N. E. 501; McCoy v. Able, 131 Ind. 417, 30 N. E. 528; Lewis v. Albertson, 23 Ind. App. 147, 53 N. E. 1071; Page & J. Taxation by Assessment, § 1015; Erickson v. Cass County, 11 N. D. 494, 92 N. W. 841; Turnquist v. Cass County, 11 N. D. 514, 92 N. W. 852; Treat v. Chicago, 64 C. C. A. 645, 130 Fed. 443; Atwell v. Barnes, 109 Mich. 10, 66 N. W. 583; Harmon v. Omaha, 53 Neb. 164, 73 N. W. 671; State ex rel. Schintgen v. La Crosse, 101 Wis. 208, 77 N. W. 167; Bryam v. Detroit, 50 Mich. 56, 12 N. W. 912, 14 N. W. 698; Patterson v. Baumer, 43 Iowa, 477; Thompson v. Mitchell, 133 Iowa, 527, 110 N. W. 901; Wood v. Hall, 138 Iowa, 308, 110 N. W. 270; Vickery v. Hendricks County, 134 Ind. 554, 32 N. E. 880; Atkinson v. Newton, 169 Mass. 240, 47 N. E. 1029; Cass County v. Plotner, 149 Ind. 116, 48 N. E. 636; Busenbark v. Clements, 22 Ind. App. 557, 53 N. E. 665.

The law presumes the regularity of all proceedings, and this includes the presumption that the improvement was a proper one, and that the land was benefited to the extent of the assessment. Page & J. Taxation by Assessment, §§ 1282, 1285, 1299; Conwell v. Tate, 107 Ind. 171, 8 N. E. 36; Morrow v. Geeting, 15 Ind. App. 358, 41 N. E. 849, 44 N. E. 59; Tripper v. Drainage Dist. 193 Ill. 230, 61 N. E. 1114; Chicago Union Traction Co. v. Chicago, 207 Ill. 544, 69 N. E. 849; Pinkstaff v. Allison Ditch Dist. 213 Ill. 186, 72 N. E. 715.

Goss, J. Plaintiff appeals from a judgment of the district court of Ransom county, holding valid certain drainage assessment taxes levied against various tracts of land belonging to plaintiff in Ransom county. Defendant holds an interest sought to be removed as a cloud on plaintiff's title, because of tax sale certificates issued him as a purchaser at a tax sale of delinquent taxes, for tracts belonging to plaintiff covered by such special assessments. Plaintiff offers to pay the amount of any valid assessment upon his lands, but alleges their invalidity.

The assessments were levied to defray a portion of Ransom county's share of the expense occasioned by the construction of a tri-county drain, commencing within Ransom county and crossing the northeast corner of Sargent county, and extending about 5 miles into Richland county, constructed in the years 1905 and 1906, to pay for which taxes were levied in 1908, with sale thereon for delinquent taxes occurring in December, 1909, at which sale defendant purchased the certificates in question. This action was begun in the early part of 1910.

Appellant attacks the legality of the proceedings leading up to the assessment, contending, for a want of jurisdiction in the tri-county drainage board, to apportion the assessment of benefits between the three counties, for the reason that no sufficient petition for such a drain was ever presented to the Richland county drainage board; and that the proceedings of the joint drainage board of the three counties was invalidated by the unwarranted participation therein of the Richland county board as a member of such joint body; further, that the levy of benefits by percentages was insufficient; also that no interest or penalty can be collected on such delinquent drainage assessments, if such assessments are valid. Other questions are raised as appear from the following opinion:

To the validity of every special assessment levied under the drainage laws, it is essential that jurisdiction exists in the board to order the establishment and construction of the drain; or that such jurisdiction can be conferred by some act; or by an omission to act upon which an estoppel to deny jurisdiction may be based, or upon which a court of equity will refuse to entertain an equitable action to set aside the tax. As a general rule, as stated in Alstad v. Sim, 15 N. D. 629, 109 N. W. 66, the primary question is whether the objections urged go to the jurisdiction of the board in the establishment of the drain, or whether, in-

stead, are but irregularities or departure from the statute in procedure
after jurisdiction is vested in the board to proceed.

The history of our present drainage laws discloses early piece-meal
legislation in which statute after statute has been repealed, to be later
followed by an entire and wholesale substitution of borrowed enactment.
Our present law has little, if any, resemblance to the early drainage
statutes. Chapter 38 of the Laws of Dakota Territory of 1875, grant-
ing to Union and Clay counties right of establishment of drains, re-
quired that the petition should set forth "the necessity of the same,
with a description of its proposed starting point, route, and terminus,
together with the names of the owners or occupants or agents of the
land through which the same may pass." The first comprehensive drain-
age act was chapter 75 of the Territorial Laws of 1883, in many re-
spects the most comprehensive drainage act ever enacted in this juris-
diction, when taken ·with chapter 76 of the same year as to bonding.
Chapter 75 provided for the filing of "a petition signed by one or more
of the landowners whose lands will be liable to be affected or assessed
for the construction of the same, setting forth the necessity thereof,
with a general description of the proposed starting point, route, and ter-
minus," with a bond to be furnished by petitioners, conditioned to pay
the expense incurred if the project was not found feasible. This was
somewhat changed by chapter 43 of the Laws of 1887. Then followed
the new and substituted act of chapter 55 of the Laws of 1893, the lan-
guage, phraseology, and substance of which, as to petition, preliminary
proceedings, and survey, is still retained in our present statutes. This
drainage act of 1893 was held void as unconstitutional in Martin v.
Tyler, 4 N. D. 278, 25 L.R.A. 838, 60 N. W. 392, because of the
unconstitutionality of its eminent domain features, the holding being in
substance that the payment provided by the act was not a money pay-
ment for property taken for public use. In the opinion on page 281,
we find: "The act (of 1893) is a general drainage law, and is largely
copied from the Michigan drainage laws." And at page 297 the court
distinguishes between the Michigan Constitution and our own, and in
so doing says: "The manner in which this provision found its way into
statutes is entirely clear. It was the result of a literal copy of the Michi-
gan drainage act." And an inspection of chapter 40, 1 Howell's Anno-
tated Statutes (Mich.), verifies this conclusion. To remedy the defects

pointed out in this court decision, chapter 51 of the Laws of 1895, practically identical with §§ 1821 et seq., Laws of 1905, was enacted. Should any doubt as to this exist, it will be put beyond question by reference to house journal of 1895, page 356, containing the committee report on this drainage bill, reading: "The committee further report that after a careful examination of the bill they find it so drawn as to avoid the unconstitutional features in the original law as construed by the supreme court, and that the amended bill now presented appears to provide legal measures to accomplish the drainage desired." Consult also Redmon v. Chacey, 7 N. D. 231, 73 N. W. 1081, testing the constitutionality of the 1895 drainage act. The petition for drain and procedure thereon, as well as practically the whole of the drainage law as it existed when the drain involved was constructed, then has parentage in the Michigan statutes as they existed after the amendments of 1887 and 1889 to the Michigan drainage act of 1885. Prior to 1885 we find the Michigan court holding repeatedly that the petition must recite all conditions necessary by statute to exist to the establishment of a drain, and holding any omission thereof a jurisdictional defect. Kroop v. Forman, 31 Mich. 144; Harbaugh v. Martin, 30 Mich. 234, and decisions prior thereto collected in a footnote; Null v. Zierle, 52 Mich. 540, 18 N. W. 348; Whiteford Twp. v. Phinney, 53 Mich. 130, 18 N. W. 593; Frost v. Leatherman, 55 Mich. 33, 20 N. W. 705, the last three construing the Michigan statutes of 1881. But later decisions upon the Michigan statutes in existence after 1885, and from which our enactment of 1893 was borrowed, presumably with that court's interpretation thereof, hold unnecessary such particularity in the petition, and that the findings of the drainage commissioner, or the court, of the existence of essential facts, cures defects in their omission from the petition. See Kinnie v. Bare, 68 Mich. 625, 36 N. W. 672; of date 1888; Hall v. Slaybaugh, 69 Mich. 484, 37 N. W. 545; Gillett v. McLaughlin, 69 Mich. 547, 37 N. W. 551.

Bearing in mind the strict construction of the petition given by the early Michigan cases, the following from the opinion by Justice Champlin, in Kinnie v. Bare, supra, is illustrative, as well as interesting, as applying equally to our present statute of nearly identical wording with the one then being construed by that court. On objection made that the petition was indefinite as to description of course and points of

beginning and termination, and failure to show the same to have been signed by freeholders of the township, the court comments as follows: "Several changes were made in the act of 1885 from the laws previously in force relative to laying out and establishing drains. The present law is a new enactment, and all other laws inconsistent with it are repealed, saving rights and proceedings commenced thereunder. Act No. 227 does not require that the petitioners shall be residents of the township; it is sufficient if they are freeholders thereof. The present law also contemplates that the course of the drain may be described by its center line. . . . It is not contemplated by the provisions of act No. 227, nor is it longer necessary, that the petition for the drain should contain an accurate description of the termini and route of the proposed drain. It could not be well done without the petitioners first went to the expense of a survey, in order to determine the feasibility of the route. This the law does not require. What it contemplates is that the termini and route shall be approximately described for the information of the drain commissioner; and it is left for him to ascertain and determine the practical route and termini. To accomplish this, he is authorized to employ a surveyor, and it is made his duty to cause an accurate survey to be made, which shall embrace the termini, route, width, length, and depth thereof; and it is expressly provided that, 'in locating such drain, the commissioner shall not be limited or confined to the precise starting point, route, or terminus set forth in the application.' " The above is applicable to § 1821, Rev. Codes 1905. In Gillett v. McLaughlin, supra, decided in 1888 under the drainage act of 1885, on questions of the sufficiency of the petition as to description of the proposed location of the drain, and that the petition failed to "show that it was signed by five resident freeholders" and therefore void for want of jurisdiction in the drain commission to act, the court says: "We have examined the petition in this case and find it sufficient to give the drain commissioners jurisdiction to act, and, with the exception of the action taken by the township board on appeal, all the objections made to the proceedings of the commissioner were such as a party interested might waive and which we think were completely waived under the evidence in the case." The syllabus reads: "In proceedings to establish a drain the petition omitted to state there was any public necessity for the same, to sufficiently describe the location, and to show

that it was signed by five resident freeholders. Neither the final order of the commissioners, nor notice of letting of contracts, contained a description of the depth and width of the drain; and on a second letting of contracts no notice was published or posted as required by statute; and the tax was assessed and entered upon the assessment roll without the proceedings being first filed with the county clerk. Held that these were such defects as might be waived by acquiescence in the proceedings." If they were jurisdictional defects they could not of course have been so waived. Such was the construction of the parent statute prior to its adoption here. And in Michigan the statutes of 1885, as amended by subsequent decisions thereon, are very persuasive of the interpretation to be given to the portions of our adopted drainage act. That no petition requirements other than those prescribed in the statute are necessary to its validity, see Brady v. Hayward, 114 Mich. 326, 72 N. W. 233, from which we quote: "It is urged that where a drain goes through or into more than one township, the application to establish the drain must be signed by not less than five freeholders of each township where such drain is situated, or the lands to be drained thereby are situated, one or more of whom shall be owners of lands liable to be assessed in each of said townships. The statute does not so read. Section 1740–B–5, 3 How. Stat. provides that the petition shall be 'signed by not less than five free-holders of the township or townships in which such drain or the lands to be drained thereby and to be assessed therefor may be situated, one or more of whom shall be owners of the lands liable to be assessed for benefits,' etc. If the legislature had intended that the petition must be signed by five freeholders of each township, it would have been easy for it to have said so. It is said the description of the drain in the application is defective. The section of the statute just referred to provides that the application shall give 'a general description of the beginning, the route, and the terminus thereof.' We think the application in that respect was sufficient." For a recent similar holding of the same court, see Auditor General v. Bolt, 147 Mich. 283, 111 N. W. 74, holding: "Where a petition for the repair of a county drain does not state that petitioners own lands liable to assessment, nor which of the owners signing are residents of respective townships, nor whether a sufficient number are liable to assessment for benefits, and prays that the repair may be made in the man-

ner set forth, though it is silent as to the manner, there is no such defect as will deprive the probate court of jurisdiction." This holding was upon an application to widen, deepen, and clean out an established drain under a statute akin to § 1835. These and other cases cited in vol. 2 of Michigan Digest of the American Digest Classification, under "Drains," establish beyond question that for ten years prior to our adoption of the Michigan drainage statutes that court had been interpreting the parent enactment liberally on jurisdictional and all questions. If, then, we follow the decisions of that state, we must hold that a written petition for a drain, reciting general course proposed, disclosing thereby that lands are to be drained, is sufficient to confer jurisdiction upon the drainage board to act, if said petition be in fact signed by six or more freeholders whose property shall be affected by the proposed drain; and that where such jurisdictional facts are found by the board to exist they are empowered by law to proceed.

And this conclusion is the only one to be arrived at from an interpretation of the statute with reference to its various amendments. Chapter 75 of the Territorial Laws of 1883, provided for the presentation of "a petition signed by one or more of the landowners whose lands will be liable to be affected by or assessed for the expense of the construction of the same, setting forth the necessity thereof, with a general description of the proposed starting point, route, and terminus," together with a bond. This phraseology evidently came from § 2 of chap. 38 of the Laws of Dakota Territory of 1875, prescribing drain privileges for Union and Clay counties, but omitting the requirement that the petition contain the names of the owners and occupants through whose lands the proposed drain was to pass. The drainage act of 1893, as borrowed from the Michigan statutes, disregarded previous legislation and left indefinite the petition requirements; and subsequent legislative acts, chap. 51, Laws of 1895, §§ 1444–1474, Rev. Codes of 1895, chap. 79, Laws of 1899, and chap. 80, Laws of 1903, have left said provisions of statute practically unchanged. After the proceedings were had for the establishment of this particular drain, chap. 93 of the Laws of 1907, defined that the petition "shall designate the starting point and terminus and general course of the proposed drain;" re-enacted in chapter 125, Session Laws 1911.

The tendency is thus shown toward less particularity in petition re-

quirements. In reality the laws of 1907 and 1911 require no more than what would necessarily have to be stated in any event, and are as lax as could be exacted and make any written petition essential to jurisdiction. The inference to be drawn from such change from stringent requirements of territorial days to the present absence thereof must certainly negative to any legislative intent that the statute shall be held, by inference or interpretation, to require more than it prescribes by express terms as to what the petition shall contain to confer jurisdiction.

Again, as well shown by the quotation from the Michigan opinion, the statute contemplates full investigation by personal inspection, survey of the route, the consideration of the opinions of those affected by the drain as to its feasibility, the weighing of the cost against the benefits to be derived,—all prior to its establishment, and all of which are to be conducted by the drain commissioners *ex parte*. There would seem to be no good reason why it should be held that, before the board can make such determination of fact, a formal petition containing all of such matters necessary to be determined by it should be presented. In this connection we might remark that the early statutes, down to and including chapter 51 of the Laws of 1895, required that the petition be signed by the owners of land to an amount greater than half the aggregate land liable to assessment. But this requirement has been omitted, and, instead, a petition for six freeholders whose property is affected is all that is required. This further illustrates the tendency toward more ease in setting the drain commissioners in operation.

On the question of purpose of the petition, and the necessity that it discloses affirmatively that it is agricultural land that is being drained, the petition recites that as proposed it is to be a continuation of the drain proposed by the other two counties, with a recommendation as to size and depth, with a statement of the course proposed. Most assuredly the drain commissioners could take judicial notice of the proposed route of the drain within the limits of their own county. Under the statute they are commanded to do even more, as they must personally examine the route. We fail to see what prejudice to anyone's rights could possibly come from such omission to more definitely state in the petition the purpose of the drain.

Counsel claims the petition for drain is unintelligible. It is true the word "that" in the second line of the petition is unnecessary, and tends

to obscure the meaning thereof, but, with the omission of this single word, the petition is as plain as English could make it. It was understood by the board, and doubtless by the petitioners and all others interested. Authorities are cited for the contention that the petition does not state facts sufficient to clothe the board with jurisdiction to act, among them the Michigan cases of Whiteford Twp. v. Phinney, 53 Mich. 130, 18 N. W. 593; Mathias v. Carson, 49 Mich. 465, 13 N. W. 818; and Null v. Zierle, 52 Mich. 540, 18 N. W. 348. These cases are all on the old Michigan statute, and not the statute from which our law was taken; and these decisions are not authority under the later Michigan holdings. Counsel cite Deisner v. Simpson, 72 Ind. 435, to the effect that "an application or petition for the construction of a ditch or drain must allege, and the allegation must be proved, that the proposed ditch or drain will be conducive to the public health, convenience, or welfare, or that the same would be a public benefit or utility to render the subsequent proceedings thereunder valid or legal." The holding is but giving force to an amendment to their previously existing law. Early Indiana holdings are to the contrary. See Brown v. McCord. 20 Ind. 270, the syllabus of which case reads: "A petition for the location of a highway need not affirmatively show that the petitioners are freeholders, or that six of them reside in the immediate neighborhood of the contemplated highway, and such facts may be proved on the hearing of the petition, although not alleged therein." The legislature of Indiana evidently made more stringent the highway and drain provisions; while Michigan, from whom we borrowed our statute, legislated the other way, toward ease of operation with less of technicality.

Appellant also cites Morse v. Omaha, 67 Neb. 426, 93 N. W. 734, a case upon a petition for repaving that city, construing a statute reading: "No repaving shall be ordered except upon the petition of the owners of the majority of the taxable front feet in any improvement tax." The statute is no wise similar to the provisions of § 1821, and we do not regard the holding as applicable. We therefore conclude that assignments of appellant based upon alleged want of jurisdiction in the Richland county board was not well taken.

Appellant urges that the order establishing the Richland county drain was too indefinite in the description of its course to establish a legal drain. The order was made after the survey, profiles, plans, and speci-

fications had been filed in the office of the auditor of said county as recited in the order made in reference thereto, tending to make more certain the description contained therein. But the description given is sufficiently definite. It is: "Beginning at a point on the county line at the southwest corner of section 6, in township 132, range 52, going thence east along the section line across sections 5 and 4 in said township and range to a point approximately the southwest corner of said section 4, where the same intersects with Elk creek, thence following Elk creek approximately 9,000 feet." See Kinnie v. Bare, 68 Mich. 625, 36 N. W. 672. State ex rel. Utick v. Polk County, 60 L.R.A. 161, and extensive note thereto. And the order having been made with reference to a survey had and plans and specifications prepared, the drain was located with particularity and definiteness.

Appellant has assigned and briefed error on the action of the Richland county board in ordering what that board termed as a spur drain "from Star Lake in section 5, in said township and range, running in a southeasterly direction to a point where the same intersects with the main drain above mentioned," quoting from the order establishing the Richland county portion of the tri-county drain. This spur drain was not petitioned for, or mentioned in the Richland county drain petition, nor in the recitations of findings preceding the order establishing the Richland county drain. It is inserted after the order establishing that drain apparently as a separate matter from the drain petitioned for. It is mentioned in the same manner in Exhibits F, G, and H. The record does not show its construction as a part of the Richland county portion of the tri-county drain, and for aught we can ascertain from the record it may have been built as a separate enterprise upon a separate petition therefor. The same can be said of another spur drain mentioned in said exhibits. If built as a part of the tri-county enterprise, had seasonable proceedings been taken and if its construction would add to the burdens of taxation to be borne by plaintiff's lands, with such facts shown, relief might have been afforded plaintiff. But he cannot be heard to complain on such grounds after sale, on proceedings to vacate the tax. Such irregularities did not go to the jurisdiction of the joint county board or the Ransom or Richland county boards. Alstad v. Sim, 15 N. D. 629, 109 N. W. 66.

Appellant has assigned error on alleged uncertainty in the per cent of

benefits as assessed to the various tracts belonging to plaintiff, and a discrepancy between the per cent as levied and the computation in specific amounts thereon after ascertainment of the total expense, and based on such total expense of the construction. In other words, appellant claims uncertainty exists as to whether the assessment of benefits to each tract is apportioned upon a basis of 100 per cent, or 1 per cent, claiming uncertainty arises because at the top of the column of percentage apportionments by decimal fractions the words "2 per cent" appear. And that because the assessments in percentages is indefinite and the specific amounts ascertained by such per cent of the total cost so apportioned to each tract is erroneous, and one hundred times what appellants assert should be the proper computation of the tax from the percentage of benefits levied, the tax spread is void. Appellant had notice that his property was chargeable with its proper share of benefits as an assessment basis. He was chargeable with notice that the manner of its apportionment to his property was to be expressed by a per cent or decimal fraction evidencing on such basis the portion of the whole expense of the project his property was ultimately to bear. That such fractional part of the whole expense was to yield his assessment. We do not construe the words "per cent" at the top of the column of decimal fractions to change the interpretation to be given the list thereunder, or render its construction any different than though the word "share" or "portion" was used, instead of the term "per cent," which in reality means decimal part, share, or portion of the whole. And such apportionment under a heading of "share," "part," "decimal part," or "decimal portion," would undoubtedly be valid as answering the statutory requirement of an apportionment by percentages. The levy is not in this respect uncertain. Such uncertainty cannot be read into the assessment or notice of assessment. The assessment as made would ordinarily be construed as the decimal fractional part of one hundred per cent, the equivalent of the whole benefits accruing from the drain across the three counties. In this connection there is no showing of an absence of a uniformity of the levy as computed with all other tracts assessed within Ransom county, nor is there any showing that in fact the assessment as computed was excessive or wrongful. The objection urged does not go to the jursidiction or the power of the Ransom county drainage board to levy the assessment as levied, but is rather an objection to the

computation of specific amounts from the benefits, and as such, goes merely to alleged irregularity in procedure. And under the authorities hereafter given, defendant is estopped, by his own laches, from asserting such irregularities in the assessment.

Appellant urges that because the tax was finally figured on the basis of an ascertained actual cost of $67,500, instead of upon the amount of the estimated cost of $60,000, as contained in the notice of review, that such increase of $7,500 over the estimated cost is invalid, and such proportion of the total expense as figured in specific amounts against the tracts involved is invalid as the taking of property without due process of law. A comparison of § 1826 with § 1821 and § 1831 will disclose that at no place is it required that the assessment by per cent of benefits to accrue to the property shall be made upon or with reference to any estimated cost of construction of the project. While the levy and notice stated the estimated cost as $60,000, it was wholly an unnecessary statement so far as it concerned the assessment by percentage of benefits. The statute contemplates the assessment by percentages based upon benefits to accrue to the property, and this wholly without regard to the estimated cost of the project. Section 1821 provides that the surveyor who prepares the profiles, maps, plans, and specifications of the proposed drain shall therewith prepare an estimated cost of such drain; but this is for the benefit of those whose lands will be affected by the drain, and for the use of the commissioners in determining the preliminary question of whether the drain shall be constructed; and is to aid in applying the rule announced by § 1822, to the effect that the benefits to be derived must exceed the cost, otherwise the drain shall not be built. And, after such decision made this estimate had fulfilled its purpose. Under Alstad v. Sim, supra, after jurisdiction has been conferred upon the board by petition, the failure of the surveyor to map the lands and make estimates of the cost may be considered as irregularities. We quote from page 635 of the court opinion: "The filing of the petition gives the board jurisdiction. . . . After the establishment of the drain the proceedings were irregular in many ways, so far as the extension is concerned. There was no survey by the surveyor and no maps or estimates were made by the surveyor." "The omissions as to surveys would not render the proceedings void in this kind of an action." "If timely objections had been made before the

board on these grounds, and disregarded, equity would interfere by injunction, enjoining further proceedings until all statutory requirements had been complied with; but courts will grant no relief in such actions when invoked solely to avoid payment of assessments which were levied in good faith and without objection from any source until after the work was completed." As the estimate of the total expense made in connection with the assessment of benefits by percentages was a needless, useless act, it cannot affect the validity of the assessment in specific amounts, which would have been unassailable even though no estimate of cost of construction had ever been made.

But the validity of the proceedings had by the joint board adopting computations of assessments in specific amounts is challenged. Appellant contends that "it was not intended (by the board) to be an assessment. If it was intended to be, it is absolutely void as such, because in specific amounts, and not in percentages; because of the lack of authority to levy it in the manner and at the time it was levied; because no opportunity of review has been had; and because it was participated in by the members of the three drainage boards, whereas the assessment against the lands in each county must be made by the board of the county."

The proceedings had by the joint board in March took place before the act of 1907 became effective on March 20th of that year. As to the power of the joint board, composed of the several county boards, it is true that its powers are limited to and consist only of meeting and agreeing "upon the proportion of damages and benefits to accrue to the lands affected in each county affected, and for this purpose they shall consider the entire course of said drain through all said counties as one drain. They may apportion the cost of establishing and constructing such entire drain ratably and equitably upon the lands in each county in proportion to the benefits to accrue to such lands, and when they have so apportioned the same they shall make written reports of such apportionment to the auditors of the several counties affected, which reports shall show the proportion of cost of such entire drain to be paid by tax upon the lands in each of such counties, and such reports shall be signed by the boards of drain commissioners of all counties affected." The statute further provides that, "upon the filing of such reports, the several boards of drain commissioners shall meet and assess against the

lands in each of such counties, ratably and equitably as provided by law, an amount sufficient to pay the proportion of cost of such drain in each of such counties, so fixed by all said commissioners." Section 1836. The duty of the joint board is to determine the proportion of the whole benefits the lands within each county will receive from the tri-county drain. It does not deal with individual tracts as such, but, instead, with a county apportionment of benefits. It considers collectively each county's lands benefited, and determines the proportion each bears to all the lands benefited; as in percentages of benefits received, so in damages, for right of way and property taken under eminent domain for public use. When this proportion is determined the full duty of the joint board has been performed, and their authority to act as a joint board exhausted. Though acting collectively when in joint session, in law each board acts severally as an integral part of the joint body. Chesbrough v. Putnam & Paulding Counties, 37 Ohio St. 508. It is true, as appellant states, that there is no provision in the statute whereby the joint board has any duties to perform after the apportionment of benefits between the counties, except that such joint board must determine the total cost of the project under §§ 1830 and 1836 as a necessary basis for computation of specific amounts from the apportionment had of benefits estimated in percentages. This apportionment as to the counties had been had in September, 1906, as appears from the recitals in Exhibits F, G, and H. The joint meeting had in March, 1907, while without authority of law as such, was three several meetings of as many boards, and amounted to the apportionment in specific amounts by each county board of the assessments against particular tracts within its county. At this meeting the Ransom county board in fact did adopt the computation made as to the specific amounts to be borne by each tract of land within Ransom county, including among them these lands of plaintiff. We do not see any prejudice resulting to plaintiff, because two other county boards at that same time acted likewise as to the lands within their counties. It does not appear that the computation made was based upon anything other than the percentages of benefits previously assessed, and upon which notice of hearing had been had as mentioned in the above exhibits, followed by confirmation. No notice is provided to be given of specific amounts so computed, it being merely a calculation from a basis, of the fixing of which notice had

been given. There was no lack of authority in the several boards to determine the specific amounts at the time of the determination thereof. Though the boards as the result of their meeting put forth the list of computations covering the lands in the three counties, signed by the three boards, it is apparent from the closing paragraph containing the direction to county auditor of each county that it was intended to operate severally upon the lands in each county, and was no more than the joining in one instrument of the three several county lists. In State v. Blake, 86 Minn. 37, 90 N. W. 5, a consolidated report on two separate bridge projects, susceptible of determination of amounts as to each, was held valid. That court's reasoning is applicable: "At most this was an informality, irregularity, or variance in the proceedings which would not affect this objector's rights or injure him in any manner. The assessment of which he complains would have been the same if the assessments, awards, or reports had been made exactly as his counsel claims; and it must follow that he was not materially injured by the fact that they were combined." A valid apportionment in specific amounts was made.

It is urged that the tax levied against plaintiff's lands was invalid because of noncompliance by the county auditor of Ransom county with the provisions of § 1827, providing for the filing in the office of the county auditor of the return of proceedings had concerning the assessment of benefits. This section reads: "After the assessment of benefits has been made . . . the board of drain commissioners shall make return thereof to the county auditor, who shall record the same in a book to be provided by the county for that purpose. Such return shall contain the petition for the drain, the minutes of the survey, signed by the surveyor, a copy of the order establishing the drain, conveyances of the right of way, if any, and the assessment of benefits." Such a return was filed with the auditor, but the evidence discloses that there was no book provided by the county for that purpose, and hence no recording of the return. What has been said by the court in Alstad v. Sim, 15 N. D. 629, 109 N. W. 66, as quoted, regarding the failure of the surveyor to make a survey, the minutes of which are required by this section to be recorded, must be applicable to the failure to record this return. We do not regard it as essential to the validity of the assessment. While the record may be intended as a benefit to the taxpayers,

by perpetuating the record of such proceedings, the mere recording thereof can be no part of the essentials of a valid tax to be thereafter levied with such proceedings as a basis, but, instead, is no more than a statutory requirement exacted of a clerical officer for the obvious purpose of procuring a record to be made. Early tax cases in this state tended toward holding taxes invalid if any departure from the statute was had in the regularity of the proceedings creating the tax. See Eaton v. Bennett, 10 N. D. 347, 87 N. W. 188, and cases therein cited. This case held the failure of the assessor to verify an assessment roll to invalidate the tax based thereon. The court there said: "Mandatory provisions—and those intended solely for the benefit of the taxpayer are mandatory—must be substantially complied with by the officials who attempt to impose the tax burden upon the citizen; and the omission to do so, under the decided weight of authority, is fatal to all proceedings based upon such attempted taxation, including tax certificates and deeds issued thereon pursuant to a sale for such pretended taxes." Much similar reasoning is there found. But later cases have expressly disapproved of this and other technical holdings on such class of statutory requirements. Douglas v. Fargo, 13 N. D. 467, quoting from page 480, 101 N. W. 919: "The mere allegation of a want of the assessor's verification is not the equivalent of an allegation that the assessment is excessive, unequal, or unjust. Such an allegation does not negative a just and honest assessment. Great stress is laid upon the constitutional provision that property shall be assessed in the manner provided by law (N. D. Const. § 179), and the contention is made that such provisions are mandatory, and any deviations therefrom render the tax void. So far as this point is concerned, we do not think that the constitutional provision has any application." See State Finance Co. v. Mather, 15 N. D. 386, 109 N. W. 350, 11 Ann. Cas. 1112, in which Eaton v. Bennett, supra, was expressly overruled in the following language, equally applicable to the statutory requirement here urged as invalidating subsequent proceedings: "We hold that the verification of the assessment roll by the assessor is not any inherently necessary part of the act of assessment proper, but is merely a legislative requirement. The act of assessment is performed as to the land when the assessor determines its value. That is all that is inherently necessary, and it is clear that under our system of real estate taxation no less will suffice.

The assessment must, of course, be evidenced by some authentic record. It is self-evident that the assessor's affidavit is not inherently essential, either as to the assessment or as an authentication thereof. The Constitution does not expressly or impliedly require it. The provision for the affidavit is a purely legislative requirement." Although the court was there passing upon a revenue measure different from that involved in Eaton v. Bennett, in speaking of that case the opinion states: "In that case the court said in effect that the act of verifying the assessment roll by the prescribed affidavit was a part of the act of assessing, and that a valuation by the assessor, although sufficient in all other respects, was no assessment if the assessor's affidavit was not attached to the roll. This unqualified language was in effect disapproved by the decision in Douglas v. Fargo. In that case the assessment rolls were not verified by the assessor's oath. The plaintiff in that case, relying on Eaton v. Bennett, asserted that there was no assessment and hence no tax. The court held that, although the defect might be fatal at law, it was not fatal in equity." Then followed the express holding quoted, that the authentication by affidavit of the assessor to the assessment roll was not an inherent part of the assessment proper; and Eaton v. Bennett is expressly disapproved in the syllabus in State Finance Co. v. Mather.

As further illustrating the holdings of recent years of this court towards sustaining the tax, as distinguished from early holdings practically to the contrary, see decisions upon the validity of descriptions in tax certificates, sufficiently shown by a comparison of the opinion in Power v. Bowdle, 3 N. D. 107, 21 L.R.A. 328, 44 Am. St. Rep. 511, 54 N. W. 404, with Beggs v. Paine, 15 N. D. 436, 109 N. W. 322. If noncompliance with the statute requiring an assessor to verify his own creation, his assessment roll, should be considered as but an irregularity, most certainly the failure of this clerical officer to record a return should not invalidate this assessment.

But additional reasons exist why the recording is not essential to the validity of the tax. Section 1828, prescribing the step next following and filing and recording of the return, required by § 1827, clearly distinguishes between the filing and recording thereof, in that it authorizes the letting of contracts (for construction of the drain) at any time "after filing the return with the county auditor," making no

reference to the recording thereof by that official as a condition precedent to the letting of contracts, but making the filing thereof such a condition precedent. This is significant. See 2 Page & Jones on Taxation by Assessment, § 1304, reading: "If it is not required by statute that certain acts must be recorded as a condition precedent to their validity, the acts of the council may be shown, although they do not appear of record." Section 907 of the same work states: "Under some statutes it is provided that the assessment when made must be recorded. Such provisions are usually made in order to give constructive notice of the assessment to the owners of the property upon which such assessments are to be levied. When this is the object of the statute, failure to record the assessment, as provided for by statute, invalidates the assessment. . . . If, on the other hand, the provision requiring the assessment to be recorded is not for the purpose of giving constructive notice, but simply for the preservation of the assessment, failure to have it recorded does not render it invalid." We cannot conclude that the object of the recording of the many previous proceedings, as required by § 1827, is to give constructive notice, as constructive or actual notice is otherwise provided to be given concerning the assessment of benefits; to that point, the most important to the taxpayer of all prior proceedings, and concerning which notice to him would be necessary previous to its apportionment, otherwise a question of taking of property without due process of law might be involved. There being no reason for concluding that such recording is meant to operate as constructive notice, such notice having been required at the step next preceding the recording requirement, we conclude that the record required to be made is for the purpose of preservation of the assessment, and the failure to record in no wise invalidates subsequent proceedings; nor does it involve a loss of jurisdiction to thereafter proceed. Instead, it is a mere irregularity. Section 1827 is a directory, as distinguished from a mandatory, provision.

Appellant raises the question of constitutionality of the entire drainage law, urging that it contravenes the state Constitution and the 14th Amendment to the Federal Constitution, in the taking of private property without due process of law. This assignment was taken prior to the final decision of Soliah v. Cormack, 17 N. D. 393, 117 N. W.

125, appealed and affirmed in 222 U. S. 522, 56 L. ed. 294, 32 Sup. Ct. Rep. 103, holding the contrary.

Appellant urges that the pendency of the first action began in October preceding the tax sale, was constructive notice to this defendant of plaintiff's intent to contest the validity of the tax and notice of any defense he might be able to interpose against its payment; and that because thereof defendant should not be heard to assert any defense of estoppel if plaintiff has established a cause of action otherwise sufficient as against these taxes. No actual notice to defendant of the pendency of said action is shown, nor is constructive notice thereof imputed by law. We know of no requirement that an intending tax-sale purchaser shall search the records of the clerk of the district court to determine whether any actions are pending against any tracts to be offered for sale. Instead, the policy of the state in such matters is to encourage bidding at sales for delinquent taxes, as is manifested by the provisions of the revenue laws requiring a refund to purchasers at void tax sales. At the time of sale plaintiff had no standing in equity as against the county of Ransom. Hence he had none as against Ransom county's transferee, this defendant.

In what we have said heretofore we have not referred to the doctrine of estoppel, waiver, or laches because of defendant's delay in commencing this action. Many courts hold that this alone is sufficient to bar him relief in equity. The uncontroverted facts certainly convict plaintiff of laches, and estop him from urging any defense other than that the proceedings had were void for want of jurisdiction; and if we follow the holdings of the state from whence we obtained our drainage law, we would hold defendant estopped from asserting a want of jurisdiction, even if there was an entire absence of jurisdiction in the first instance in the Richland county board to entertain these proceedings. See Farr v. Detroit, 136 Mich. 200, 99 N. W. 19; Atwell v. Barnes, 109 Mich. 10, 66 N. W. 583; 4 Dill. Mun. Corp. 5th ed. 1455 et seq., citing cases and classifying states on this question.

We will briefly recite the record bearing on estoppel. Proceedings were had in all three counties, purporting to establish the drain in the respective counties, in the summer of 1905. On July 26, 1905, the order establishing the drain in Richland county was made upon a petition previously filed, and under the stipulation of regularity of con-

duct of proceedings made by counsel, as well as from the presumption of regularity of official conduct, the petition upon which this order was based must have been filed a sufficient time before to have allowed an examination, survey, specifications of the ditch, and map of the lands to be drained, to be made and filed with that board prior to July 26, 1905. Such proceedings were had in Ransom and Sargent counties that an attempted apportionment of benefits by percentages between the three counties by the joint drainage boards was had October 17, 1905. Before this date certain expenses thereunder were incurred. Afterwards, for alleged irregularity, the drain board of Ransom county set aside its proceedings theretofore had, and on August 27, 1906, the joint drainage board of the three counties vacated all prior action taken, and determined the value and labor expended in such prior invalid proceedings. Acting pursuant to § 1841, the joint board gave notice of a hearing to be held before it to determine the value of such services and labor previously performed. This hearing was set for September 23, 1906, under an order dated August 27, 1906. Coupled therewith was a notice given by the joint board of a reapportionment of benefits by percentages to be apportioned to the land throughout the entire course of the drain. The Ransom county board afterwards renoticed such apportionment as to Ransom county, under notice dated September 25, 1906, setting time of hearing for October 9, 1906, noticing confirmation at that time of the apportionment as made by percentages and of the percentage of the whole estimated cost apportioned as Ransom county's share thereof. The following appears from the minutes of the Ransom county board of proceedings as had by them on October 9, 1906: "The commissioners having duly considered the assessment against the lands described in said notice of review and assessment, the same are hereby confirmed and established." In the notice of review and confirmation, under a column headed "per cent," the decimal fraction of the proportion of the entire estimated tri-county expense of $60,000 was designated as the percentage or decimal fractional part of such total expense to be borne by each individual tract, including therein all the land of plaintiff subsequently assessed in specific amounts. Thereafter such proceedings were had that a joint meeting of the tri-county board was held March 7 and 8, 1907, after due notice given by publication, to determine the apportionment in

specific amounts by the entire expense to be borne by the three counties. The joint board there determined that it had expended as the cost of excavating in Sargent and Richland counties $30,660; and Ransom county, $23,677. That the cost of bridges had been $4,722, and interest on warrants $1,500, and cost of surveying and warrants for other expenses $6,536." And that future incidental expenses would be $1,535, making a total cost of $67,500 for the drain through the three counties, of which amount about $66,000 then had been expended. At said meeting, under arrangements previously made, Mr. Wallace, as attorney for the board, presented a list of all lands to be assessed in the three counties, with the tax in specific amounts calculated as to each piece or parcel. The minutes of the board in such respect are as follows: "Mr. Wallace having completed the list showing the amounts of tax that each piece or parcel of land was liable to pay on account of the construction of what is commonly known as tri-county drain, said lists are, on motion, adopted." And he "as authorized to serve a copy of said lists on the various township boards, and to file a copy with the respective county auditors of Ransom, Richland, and Sargent counties." The list was signed severally by each and all the boards and their members as the joint act of the tri-county board and the several act of each county board. It contained the following order: "Be it known that we, the undersigned drain commissioners in and for the counties of Ransom, Sargent, and Richland, in the state of North Dakota, hereby fix and determine that the several sums respectively set opposite each of the following municipalities, lots, or tracts of land shall pay, by reason of the benefits thereto on account of the construction of said drain, to wit." Then followed the list of assessments, and thereafter, immediately preceding the signature of the boards, was the following order: "And the county auditor of the county in which each piece or parcel of land is respectively located is required to extend upon the tax list as a special tax the amounts respectively set opposite each description within his county as aforesaid, specifying in such list for which drain the tax is levied; and the same shall be levied as a tax against such descriptions for the year 1907, unless bonds are issued therefor." This list was filed in the office of the county auditor of Ransom county June 18, 1907. It contained descriptions of all of plaintiff's land in Ransom county, together with the assessment apportioned to each tract; and

thereon the tax assailed was spread as a tax against said tracts for the year 1908, becoming due December 1, 1908, and delinquent March 1, 1909, and going to sale in December, 1909, at which delinquent tax sale defendant purchased tax-sale certificates therefor. In October 1909, an action was instituted in the district court of Ransom county to enjoin the county and its auditor and treasurer from collecting or receiving these drain taxes, and asking their cancelation. But no injunctional order issuing, the sale for delinquent taxes was not restrained; and said action was dismissed prior to the commencement of this present action, brought against the defendant as a purchaser at the sale. This action was begun February 11, 1910, and trial had below in June following. Plaintiff testifies that during all times involved in these proceedings he has owned the lands assessed; that right of way across certain of plaintiff's lands in Sargent county was given or sold by him for a portion of the tri-county drain within that county. His testimony proves his actual knowledge of proceedings from their inception.

We quote his testimony:

Q. You knew from the time of the commencement of the proceedings for the construction or building of the ditch, up to the present time, all about that ditch, did you not? A. I knew of it in a way.

Q. You knew it was being constructed? A. Yes.

Q. How much of it was being constructed? A. Yes.

Q. Did you ever take any steps to test the legality or validity of these actions? A. I don't suppose I did.

Q. Did you make any protest to the drain commissioners of Ransom county in regard to this ditch? A. No. I didn't until I had notice of the way the assessment was made and the amounts.

Q. Did you make a written protest against your assessment? A. No, I didn't have a chance; my assessment was made before I knew anything about it; I didn't suppose it would be so high, and I didn't believe it would be over one fifth or one fourth of what it was.

Q. You never made any protest against the drainage board? A. I don't remember that I did.

Q. And you were lead to believe that the cost of the construction of the ditch was not to exceed $40 to $50 per quarter section on the land, and that these were assessed the heaviest? A. Yes.

23 N. D.—26.

Q. State whether or not it was for this reason that you brought no action to prevent the building of the ditch. A. It was.

It is clear that plaintiff has remained inactive and acquiescent for ·five years in the proceedings had, from the summer of 1905 until the commencement of this suit in 1910, with full knowledge that great expense was necessarily being incurred in the construction of a drain, for a portion of the benefits of which over 1,000 acres of his land would be assessed; and with knowledge imputed to him that his property would necessarily have to carry its proportionate share thereof. He never murmurs until after the state has forced collection and defendant has invested the amount of the taxes on sale. Then, and not until then, plaintiff seeks to avoid payment for the benefits of his land, the basis of the tax; and to that end does not hesitate to, by the precedent set in this action, jeopardize over $65,000 of obligations other than his own, similarly incurred, that he may escape the payment of his proportionate share of the total expense of the project. And with this most inequitable prayer he enters a court of equity, seeking relief under guise of equity.

This is not the first time such a claim has been urged in similar proceedings, to be condemned as untenable. See Erickson v. Cass County, 11 N. D. 494, 92 N. W. 841, from page 509 of which we quote: "The drain is ten miles in length and its construction necessarily covered a considerable period of time, and, as we have seen, involved the expenditure of large sums of money and the contracting of many obligations. The period of time covered and the character of the work being done makes it necessary to assume that the plaintiffs whose lands are adjacent to the ditch were fully cognizant of all these facts. No steps of any kind were taken by any of the plaintiffs to arrest the progress of the work or to challenge its legality in court, by notice to the board or to contractors or otherwise. This action was not instituted until the drain had been fully completed and after all of the benefits accruing therefrom had been conferred. Under such circumstances a court of equity will not stop to inquire into questions of legality or irregularity. The cases are numerous and the courts unanimous, we believe, in denying equitable relief on facts such as are here presented." In the case cited it is true part of the plaintiffs were petitioners for the

drain, but the facts on the whole in that case are not more inconsistent with the granting of equitable relief than in the case before us, in fact or in law. See also Turnquist v. Cass County, 11 N. D. 514, 92 N. W. 852; Alstad v. Sim, 15 N. D. 629, 109 N. W. 66, from the syllabus of which we quote: "Persons whose lands are assessed for benefits on account of a drain will not be heard in a court of equity when asking for a perpetual injunction against the collection of assessments against their land, on account of benefits, after the drain is completed, they having had notice of the fact that work was being done on the drain pursuant to proceedings authorized by the drainage board."

But counsel seek to differentiate these cases cited from the case at bar, claiming that "the doctrine of estoppel by failure to object to an improvement is only applicable in actions against the county when seeking the extraordinary relief of injunction or cancelation of a tax; and it has no application in actions between individuals, affecting titles or interests in lands under purchase at tax sales." And counsel call attention to the fact that, in the previous drainage cases before this court, an injunction was asked against the county or its officials to restrain collection of the tax, or otherwise attacking it. They cite as a principle applicable the portion of the opinion in Eaton v. Bennett, 10 N. D. 346, 87 N. W. 188, on page 350, there distinguishing actions permissible between private parties from those between an individual and a county, in tax matters. The court there held such a distinction to exist in principle, in the following: "It is true that a majority of this court held in Farrington v. New England Invest. Co. 1 N. D. 102, 45 N. W. 191, that a court of equity will not enjoin the enforcement of a tax on the ground that the assessment was irregular or void in this, that the assessor's oath was not attached to the roll. The reasons for so holding are set forth in the opinion, and were satisfactory to a majority of the court as it was then constituted. But that case will show that the rule there laid down has no application to a controversy such as this in which public rights are not involved and where private rights are alone at stake." But this is not the only case in which such a distinction has sought to be applied in tax cases. In Douglas v. Fargo, 13 N. D. 467, 101 N. W. 919, in distinguishing that holding from Farrington v. New England Invest. Co. supra, on page 479, the court makes use of the following language: "The cases in which the rule of

that case has been modified were not cases involving the same facts, and were cases between individuals involving private rights in which the public was in no way interested. Such cases were expressly excepted from the rule laid down in the Farrington Case." And the court adheres to the necessity for tender of payment of void taxes in an action by an individual against the taxing municipality, by the following at the close of the opinion: "Conceding, then, for the purpose of this case, that the levies and assessments are void in courts of law, still under the rule in the Farrington Case the defects, omissions, irregularities, or illegalities do not bring the assessments or levies within any of the classes of assessments or levies that are held void, to the extent that tender or payment may be dispensed with in a purely equitable action." Because the municipality was involved, the case was distinguished from Power v. Larabee, 2 N. D. 141, 49 N. W. 724; O'Neil v. Tyler, 3 N. D. 47, 53 N. W. 434; and Eaton v. Bennett, 10 N. D. 346, 87 N. W. 188, they being cases between private individuals and where a tender of void taxes was held unnecessary prior to relief. A distinction was thus drawn as to the necessity of tender, based on whether the action was against the taxing municipality or between private individuals; in the former, a tender being held necessary, in the latter, not. Such distinction was urged in State Finance Co. v. Beck, 15 N. D. 375, 109 N. W. 357; Fenton v. Minnesota Title Ins. & T. Co. 15 N. D. 365, 125 Am. St. Rep. 599, 109 N. W. 363; Powers v. First Nat. Bank, 15 N. D. 466, 109 N. W. 361; State Finance Co. v. Mather, 15 N. D. 386, 109 N. W. 350, 11 Ann. Cas. 1112,—in which series of decisions the distinction for which recognition is here asked, and which was there presented on the necessity of tender of payment of taxes, is expressly disaffirmed. In State Finance Co. v. Beck, 15 N. D. 375, on page 381, 109 N. W. 357, on page 359, the court, in denying the soundness of this distinction, uses the following language, as applicable to the case at bar as to the one there under consideration: "We recognize the fact that this decision is in conflict with the practice heretofore prevailing as established by the decisions of this court. Those decisions were cited in Douglas v. Fargo, 13 N. D. 467, 101 N. W. 919. It is true, as pointed out in that case, that there is a distinction between a suit for cancelation against the county, such as that, and an action to quiet title such as this. The difference is only

in form, however. Both invoke the equity jurisdiction of the court for the same purpose; namely, the cancelation of an adverse claim. The inherent powers of the court as an equity tribunal, and the general principles governing the court in equity cases, are precisely the same in whatever form the questions are presented." And, again, in Powers v. First Nat. Bank, 15 N. D. 466, on page 469, 109 N. W. 361, on page 363, the court says: "This is an equitable action to be determined on equitable principles, although the county interests be eliminated from the issues. The plaintiff seeks the cancelation of certificates and the setting aside of levies and taxes. He seeks to set aside the lien created by a tax certificate. He asks for general equitable relief. Under the issues framed, it is an equitable action and held to be such in this state. . . . The relief sought is equitable. Hence equitable principles must be applied in the determination of the issues. The mere fact that the action is between private parties only is not enough to take it out of the rules applicable to equity cases. It is not an answer to say that the doctrine of *caveat emptor* applies in suits to determine the validity of taxes, sales, or tax deeds. That rule does apply in such cases, but that does not justify a court of equity in holding that a tax-sale purchaser shall be compelled to look elsewhere for his money, and the owner be relieved from all payments and burdens imposed upon owners of property by the revenue laws. The owner comes into a court of equity asking that he be relieved from tax proceedings which he claims to be illegal. Before his prayer should be granted, he should do equity himself, and reimburse the tax purchaser, and save the county from the burden of having to pay out the money received as taxes on the plaintiff's land which the latter does not claim not to owe. A new rule is announced in this case overruling previous cases in this court. So far as the application of this equitable principle in actions between private parties to determine the validity of tax sales or certificates or deeds is concerned. Upon mature consideration we conclude that no sound distinction can be drawn between such actions and those against public officers, that will warrant the application of this equitable principle in the one case and withholding it in the other." Which holding is followed in Fenton v. Minnesota Title Ins. & T. Co. 15 N. D. 365, 125 Am. St. Rep. 599, 109 N. W. 363; Noble

v. McIntosh, ante, 59, 135 N. W. 663, and Tee v. Noble, ante, 225, 135 N. W. 769.

Counsel then incorrectly assume that a distinction now exists in equity between actions against public officials to annul a tax, and actions between private individuals to quiet title. No distinction being recognized in equity as existing in such actions, we see no reason for departing from the reasoning illustrated by the foregoing quotations. We hold as applicable in this action between individuals the rule of estoppel available had the individual sued the county before defendant purchased the county's interest in the tax at the sale. Defendant may invoke the doctrine that plaintiff has, by his delay, laches, and neglect, barred himself from asserting the invalidity of the tax in question because of irregularities not jurisdictional. Alstad v. Sim, 15 N. D. 629, 109 N. W. 66; State Finance Co. v. Trimble, 16 N. D. 199, 112 N. W. 984.

Appellant does not question the jurisdiction of the Ransom and Sargent county boards, except as an alleged want of jurisdiction might result from the alleged wrongful participation, without jurisdiction, of the Richland county board in the proceedings of the tri-county drain board. The proceedings of the Richland county board not being vulnerable to attack for jurisdictional reasons, the jurisdiction of the several and the tri-county boards cannot be questioned. With jurisdiction existing, in the absence of fraud, plaintiff is estopped from urging the invalidity of the assessment because of irregularities in the levy of the tax. Although appellant has briefed an assignment based on alleged fraudulent conduct of the board of Ransom county, the proof of fraud is wholly wanting, all that can be said to be established being that two of the board were in 1907 removed, if even that can be deemed proven. Assuming their removal for fraud, there is no proof that the fraud was committed in connection with the drain here involved, and consequently the proof in that respect is immaterial and without this case.

Our holding being that the special assessment upon the lands of plaintiff was valid as such, we now consider the proceedings had after such tax became due. This involves the assignments concerning the validity of the tax sale because of defective notice thereof; and, further, the right of the municipality to collect, by sale or otherwise, the

usual tax penalty and interest imposed after delinquency for failure to pay these special assessments. In order that no question of the effect of § 1578, Revised Codes 1905, making certificates of sale otherwise valid prima facie evidence of regularity of all prior proceedings except as provided by said statute, whereby under the decision of Beggs v. Paine, 15 N. D. 436, 109 N. W. 322, if the sale was had under the proper notice, the statute might foreclose raising the question of penalty on sale, which we do not decide however, we will first consider the validity of the sale.

Plaintiff's land was described by specific tracts, together with all other lands in the civil township of Rosemead. But Rosemead township was erroneously described in the first required published notice of sale as in range 55, instead of its correct description as range 53. After the first publication, correction was made, and the publication was continued with the correct description for the remaining required publications. Does this discrepancy in the notice of sale invalidate the sale as to this particular land within Rosemead township? The trial court held the sale void, and, in our opinion, properly so. Respondents contend that this defect in description was but an irregularity. It is true that plaintiff was bound to know the statutory time fixed for such tax sale, and that his special assessments were unpaid and a lien upon his sale, and that his land was subject to sale thereunder, and that the description in the assessment as spread upon the county tax records was correct. Respondent claims that, by the designation of such civil township by its proper name, notice was thereby constructively given, to the effect that such description by name should control over the particular description; and that in general the published notice sufficiently described the land to inform the owner that his land was to be sold. Respondents contend that the test of sufficiency in relation to description of real estate in tax proceedings is whether a man of ordinary intelligence would identify the land described with reasonably certainty, the rule announced in 37 Cyc. 1295; Doherty v. Real Estate Title Ins. & T. Co. 85 Minn. 518, 89 N. W. 853, and other authorities cited. We recognize the rule as undoubtedly the proper one, but the facts do not come within the rule. The description as published was indefinite in that uncertainty existed as to whether the sale noticed was for land in Rosemead township or in the township described.

Notice might be taken that the township described was within the limits of Ransom county, but that does not alter the fact that the particular description of the land to be sold was uncertain; and as to such land in Rosemead township no notice of sale was given. Two publications do not answer the statutory requirement of three, the statute being mandatory, as is established by a line of decisions in this state. Sweigle v. Gates, 9 N. D. 538–544, 84 N. W. 481; Dever v. Cornwell, 10 N. D. 123–129, 86 N. W. 227; Lee v. Crawford, 10 N. D. 482, 88 N. W. 97; Beggs v. Paine, 15 N. D. 436, 109 N. W. 323–330; Nind v. Myers, 15 N. D. 400, 8 L.R.A.(N.S.) 157, 109 N. W. 335. 2 Cooley, Taxn. 928–938; 2 Page & J. Taxation by Assessment, §§ 1174 & 1178; Blackwell, Tax Titles, § 416. The sale was void.

Counsel contends that these drainage assessments bear no interest and that no penalty can be imposed for their nonpayment, the statute not having specifically provided for the collection of interest and penalty upon drainage assessments. Respondent cites the various provisions of the revenue laws, and urges that they sufficiently cover such special assessments to authorize the collection of interest and penalty. Section 1831 provides that these special drainage taxes "shall be collected and enforced in the same manner as other taxes." Section 1832 provides the county treasurer shall collect and credit the same to the drain fund to which the tax belongs. Section 1575 is a general provision of the revenue laws, that "all penalty and interest collected on taxes shall belong to the county and become a part of the general fund, or of such other fund as the county commissioners may direct; except the penalty and interest collected on special assessment due to cities, and all such penalties and interest shall be paid to the city thereunto entitled." Section 1571 provides: "All real estate taxes shall become due on the 1st of December in each and every year for which the tax is levied, and become delinquent on the first of March following, and if unpaid there shall attach thereto a penalty of 3 per cent as soon as the same becomes delinquent." And § 1722 declares all taxes upon real property a paramount lien thereon. Chapter 298, Session Laws 1911, provides that special assessments for drainage purposes shall bear interest and penalty after delinquency, and is the first statutory provision to explicitly and definitely require interest and penalty to be paid on drainage assessments.

Cooley on Taxation, vol. 1, pages 452 and 464, lays down the general rules for construction of revenue laws. This authority rejects the doctrine that tax laws are to be given a strict or narrowed construction in favor of the taxpayer and against the state, because they are revenue measures, but rather "the construction without bias or prejudice should seek the real intent of the law; and if the leaning is to strictness, it is only because it is only and fairly presumable that the legislature which was unrestrained in its authority over the subject has so shaped the law as without ambiguity or doubt to bring within it everything that was meant should be embraced." And accordingly the same authority in vol. 2, page 902, declares the rule that "penalties [in matters of tax collection] must be plainly imposed or they cannot be exacted. . . . The laws imposing them must be followed strictly, and they cannot be given retroactive effect." The most instructive case on the subject probably is Vicksburg, S. & P. R. Co. v. Traylor, 104 La. 284, 29 So. 141, where numerous authorities supporting this appellant's position are collected. Consult, also, Henderson Bridge Co. v. Com. 120 Ky. 690, 87 S. W. 1088; Illinois C. R. Co. v. Com. 30 Ky. L. Rep. 190, 98 S. W. 1008; Chicago, R. I. & P. R. Co. v. People, 217 Ill. 164, 75 N. E. 368; Murphy v. People, 120 Ill. 234, 11 N. E. 202; Hosmer v. Hunt Drainage Dist. 134 Ill. 317, 25 N. E. 747; Bucknall v. Story, 36 Cal. 67; Bump v. Jepson, 106 Mich. 641, 64 N. W. 509; Ankeny v. Henningsen, 54 Iowa, 29, 6 N. W. 65; Augusta v. Dunbar, 50 Ga. 387; Sargent v. Tuttle, 67 Conn. 162, 32 L.R.A. 822, 34 Atl. 1028; 37 Cyc. 1542–1546, that "the imposition of such penalties will be strictly and carefully limited to the exact amounts and the precise contingencies laid down in the law; anything beyond this is null and void."

The fact of the amendment by the last legislature signifies a legislative construction that, prior thereto, penalty and interest could not be collected on drain assessments, otherwise no necessity existed for the amendemnt. The foregoing authorities distinguish also in principle between ordinary taxes and special assessments. The latter are for the sole purpose of reimbursing expenditures incurred for improvement of or benefits to property of the individual. Special assessments are not, strictly speaking, for the collection of public revenue, and, in the absence of statute so requiring, no reason exists for the collection

of more than the amount of the principal, with simple interest, to liquidate the amount due for the benefits received. Though the statute permits the collection and enforcement of the assessment in the manner provided for tax collections, we hold that the penalty and interest provided by statute, to be collected for nonpayment of general taxes after delinquency, cannot be exacted. But instead under §§ 5508–5510, there should be collected the amount of such drainage assessment or special tax, together with 7 per cent interest per annum from the date said tax became delinquent, March 1, 1909, to the time payment of said assessment shall be made. State Finance Co. v. Beck, 15 N. D. 375, 109 N. W. 357.

One other question remains. Plaintiff has tendered to the county treasurer of Ransom county prior to tax sale the full amount due because of his general taxes for the year in question, for all of the land involved. This the county treasurer properly accepted, but thereafter, presumably acting under the mistaken apprehension that the general land taxes could not be paid without full payment therewith of the special drainage land assessments in question, retendered the money to plaintiff, who refused to receive the same. Thereafter sale was had for such general taxes separate and apart from the sales for the special assessments. This sale as to general taxes was void, as the general taxes had been fully paid. That the payment of special taxes cannot thus be enforced, see State ex rel. Moore v. Furstenau, 20 N. D. 540, 129 N. W. 81, holding that the payment of general taxes may be made without the payment of special assessments against real estate. The certificates issued on such sale for general taxes are void, and judgment is directed to be entered canceling them. Appellant contends that the certificates issued on the sale are void for the further reason that, while the assessments are made against each individual tract, the sale was had in certain instances for several tracts together, and certificates of sale covering several descriptions in one certificate were issued to defendant. It is unnecessary to pass upon this assignment, holding, as we do, the certificates to have been issued without the statutory notice of sale having been previously given.

We hold, then, that the special drainage assessments involved are valid, and as such are liens existing on the day of the purported sale for the amount of said assessments, exclusive of any attempted charge

of penalty or costs in favor of Ransom county; to which rights of the county, and all thereof, this defendant by this sale became subrogated in equity, and which rights he still possesses, and for the protection of which a court of equity should provide in determining the relief to be adjudged in the action. Revised Codes, 1905, § 1585. If precedent is needed, we have it in Beggs v. Paine, 9 N. D. 538–544, 84 N. W. 481; State Finance Co. v. Beck, supra, and Fenton v. Minnesota Title Ins. & T. Co. 15 N. D. 365, 125 Am. St. Rep. 599, 109 N. W. 363, for both the principle of subrogation and the form of judgment to be awarded.

Accordingly the district court of Ransom county will enter a provisional decree permitting the payment to the defendant (or in lieu thereof, to the clerk of said district court to be paid to the defendant on his demand) of the amount of the special assessments on all of plaintiff's lands involved, within the period of sixty days from the date of the filing of the remittitur herein with the said district court; which amount to be so paid, in addition to said special assessments, shall include interest thereon at 7 per cent per annum computed from March 1, 1909, to the date of such payment. And in case said payment is so made the tax-sale certificates issued on said purported sale to enforce collection of said special assessments shall be adjudged canceled and void in the final judgment to be thereafter entered accordingly. But in default of such payment of such assessments in full, including both principal and interest as above, and within said sixty-day period, upon the expiration of the same with said special assessments remaining unpaid, final judgment shall be entered dismissing this action and denying plaintiff any relief on the merits thereof as to said special assessments and tax-sale certificates thereunder. In view of the judgment granted, the costs of this court will be taxed as to appellant's briefs and abstracts only in favor of appellant and against respondent herein, if payment of said special assessments are made; but if not made, costs are to be taxed and judgment to be entered on dismissal of this action in respondent's favor for all taxable costs and disbursements of respondent herein. Let judgment be entered accordingly.

We should mention that according to counsel much litigation growing out of this same drain is in the trial courts of these counties, awaiting the outcome of this decision. To that extent this is decisive of

many similar actions. We have endeavored to fully pass upon all points raised and presented, hoping to thus furnish precedent decisive of all litigation awaiting this decision. One E. R. Moore, a purchaser on said sale and interested in the event of this decision, has, by permission of court, filed by his counsel an intervener's brief in aid of defendant.

SPALDING, Ch. J. I concur in the result on the grounds covered by ¶ 6 of the syllabus.